Um, Mr. Cuff, you may begin. I should correct myself. This is also 25-70-28. I neglected to mention that.  Good morning, Your Honors. My name is Sean Cuff, and I represent Appellant Joseph Z. Womble. And may it please the Court, I'm hoping to reserve some of my time for rebuttal. This Court is no stranger to Mr. Womble's case. In fact, to frame my argument this morning, it's helpful to recall what this Court has already decided, specifically that Mr. Womble's allegations met both the objective and subjective component of his food deprivation and inadequate facilities claims under the Eighth Amendment. Of course, while that's not dispositive on summary judgment here, that decision helped set the table for Mr. Womble's opposition. Beyond establishing clearly established rights, Mr. Womble only needed to produce competent evidence of constitutional violations, enabling a reasonable jury to return a verdict in his favor on summary to avoid summary judgment. The record confirms Mr. Womble made that showing to be sure Mr. Womble's declaration and his deposition to his testimony, both competent evidence in their own right, are filled with excruciating details confirming Mr. Womble's constitutional violations. Now, if the Court hasn't done so already, I encourage you to read the portion of Mr. Womble's direct examination from his deposition. It's at Appellate Volume 4, 915 to 28. This includes evidence that Mr. Womble looked down at his tray and saw evidence of rationing in front of his face, slots missing food on his tray, and how he lost 12 pounds in two weeks due to such rationing. He also recalls exactly where he was in the prison when he asked Defendant Sharp for more food and he got a response, son, you should be grateful you get food. He also testified how it took days or up to a week to fix the lone bathroom available for 32 inmates when it was out of order, leaving standing feces and urine in the bathroom for days, and how he soiled himself waiting for a restroom three to four times. And while the District Court and defendants dismissed Mr. Womble's evidence as, quote, his own word or conclusions or conclusory testimony, that doesn't mean that that evidence wasn't competent to create factual disputes to avoid summary judgment. It was. Because a reasonable juror could find that the evidence amounted to constitutional violations, the District Court erred in issuing and entering summary judgment months before Mr. Womble was set to present his evidence to a jury. The District Court further erred in awarding over $5,500 in litigation costs, despite defendants conceding Mr. Womble's indigency. And while we're set for consolidated appeals this morning, my argument's gonna focus on the constitutional claims dismissed on summary judgment starting with Mr. Womble's food deprivation. Before we do that, it's helpful to me to know what evidence we're looking at. And with respect to the expert report, I mean, in fact, it didn't have a lot of reliance on facts and data, did it? Well, it didn't rely on data produced in the record, specifically Mr. Womble's evidence. A large part of it was from his 2019 declaration, but that is evidence that she relied on in the record. She relied on his recollection of one day's meals, correct? Correct. And she extrapolated that as if that was what he was served every single day for the entire period that's at issue. Correct. Is that problematic in terms of whether that expert report should have come in? No, for two reasons. First, I think Womble's testimony is clear, both in his declaration and in his deposition, that that was indicative of what he was served on a daily basis. It might not have been those exact portions, but his testimony is clear that the rationing is constant from May 2014 to August 2016. Now, whether that varied from the specific portions and food served that she used in that one day example, it may, and I think in his deposition, he recalls very well exactly what was served on certain days. There was bologna on certain days and there was chicken cutlet on different days, but I think that example for one day is sufficient here. And then disputes about, second, disputes about the underlying data in the report should go to the weight of the evidence here, and I don't think the admissibility of her report. So I think it should be considered. Well, her report is essentially a mathematical calculation, and if you say that he admits that it wasn't always the same, well, it would change the calculation. If the meals that he had were a different number of calories, right?  I mean, I find that, you know, we've got a four-page report that really doesn't have much of anything supporting that. Sure, and that's fair, and I think, but what we're thinking about here is not only in terms of that specific example, but I think when you look at the other evidence in the record, it is indicative of what typically was served. So while I agree that there are difficulties in extrapolating that single day for the course of 18 months here, that example, I do think, bears enough relevancy and enough relation to what he was served. Week in, week out, that it can be considered, and again, I think it should go to the weight of her admissibility, of the testimony, not its admissibility, and that should be something the jury should consider when this case gets remanded for trial. Counsel, do you need the expert report to succeed on your food deprivation claim? No, it certainly helps, and I think there is, the expert report in itself is evidence of a sufficiently serious condition under the objective component, but in terms of, you know, we disagree that it should have been excluded, but without it, there's more than enough in the record to meet both the objective and objective. Was there any medical evidence in the record that Mr. Womble was malnutrition, malnutrition, malnourished, excuse me? There is evidence of, the medical report was attached in our opposition to summary or judgment, and you can see all of the various reports he made to medical. In terms of what he specifically reported about food, there are a few instances in there, but I think the best that we can glean from the medical reports is his consistent weight fluctuations, because it shows a drastic timeline of the weight fluctuation that should be attributed to. Was he ever underweight? Was he ever underweight, excuse me? I mean, he did lose 20 pounds. No, I didn't ask how much he lost. Was he ever underweight? I'm not sure what you're setting as a benchmark. How about his BMI? Does it show a below average BMI? There's no evidence in the record of what his BMI is in particular that I'm aware of. We do know what he started at, right? And it was at 210 pounds. Within two weeks, he was down to 198. And he was down to 191 at his lowest, which was- Well, he was trying to lose weight, right? For medical reasons, was he not? No, I disagree with that. I think the record shows that he did move to diet for health. That was to get healthier food in terms of the processed food and he's clear in his deposition that he did seek diet for health because some of the food that was served in the main menu was disagreeable to him and caused him to get sick and have gastritis and particular digestive problems. But to suggest that Mr. Womble was dieting in any circumstance here, I think is incorrect and inconsistent with the record here. Well, there- Just one question. So the diet was the same number of calories? The special diet that he was requesting gave as many calories as the ordinary diet? Yes, because I believe under the standards for the facility, there needed to be baseline caloric food in each menu, but the problem was not only were slots empty in the diet for health because of the rationing, so he was receiving less food then, but then also at times, there was two separate lines at the facility, sometimes three, one for kosher, one for diet for health, and one for the standard main line. At times, when he was signed up for diet for health and they weren't serving the diet for health menu that day, there's testimony in his deposition that Mr. Kosatsky would not let him go through the line to get that food. So yes, and to your point, Your Honor, there's evidence in the record that Mr. Womble did voluntarily skip meals, but I think that the reason for that is important and it's in the record. He missed these meals because oftentimes, these meals were served constantly. He knew what days was bologna, he knew what days was chicken cutlet, he knew what days what they were serving. And on certain days, if he knew that it was chicken cutlet and there was no alternative, he knew that that was either processed or left out overnight and often spoiled. And so it was the choice for him whether I'm going to eat this that I know is gonna make me sick or if I'm gonna try to supplement my diet through the canteen and skip this meal. It wasn't a situation where he was actively trying to lose weight. I don't agree with that premise. Did the defendants know about his weight loss? His weight loss in particular, I'm not aware of that. They did know that he was- Don't they need to know if they're going to be indifferent to his health condition? Well, they knew that he was receiving less food than that he wasn't receiving enough food. There's testimony in the record that he approached them two to three times that he wasn't receiving enough food and that the food was falling below ACA standard. That's in the RTS's agreements. So he was alerting defendants to the fact that the food was falling below constitutional standards and that is enough for the subjective component. When you say constitutional standards, what's your measure of that? Sure, and I think- If so many calories are constitutionally required for someone of that height or whatever? I don't know that we can set a specific calorie number on it. And I think, to your point, there's no clear definition of what a food deprivation, sufficiently serious condition is for the objective component. But I think if Ramos is going to have any meaning here and some of the other cases from other circuits, we need to look at a sustained period of food deprivation, whether that is, you know, deprived of nutritionally adequate diet for 14 straight days. That's in the Phelps case we cited. Losing a certain amount of weight in a certain amount of time period we've seen in other cases. That's from Davis out of the Eighth Circuit. So it needs to- Oh, you're referring to the objective component. Sure. For the subjective component, the defendants have to know this, right? That it's constitutionally inadequate diet. Sure. So how do we give them guidance? How can we say that their failure to provide this was a result of deliberate indifference? Well, I think when it comes to the evidence here, I think there is circumstantial evidence that they would see Mr. Womble on a daily basis and see what he looks like, see if he's losing weight. So I think if they could observe him, they could observe his state and they could observe what Mr. Womble looked like. And when we see the evidence here that he is pleading with them two to three times while this rationing was taking place that he needed more food, I think he's doing everything he can to put them on notice of the fact that he is not receiving enough food. And whether or not he has alerted them to the fact of his specific weight loss, I'm not aware of anything specific in the record, but I don't think that that necessarily needs to happen for us to get there in the subjective component. Moving to the inadequate facilities case, I also think this is another situation where the district court refused to accept Womble's evidence, competent evidence in the record and weighed it inappropriately in favor of defendants. We see this time and again, both in the district court's order and in defendants' briefing. Rejecting Mr. Womble's competent evidence just as self-serving testimony of his own word, but this evidence was enough to defeat summary judgment and to create material factual evidence. Does the evidence show how many times the toilets overflowed? We have evidence in the record that at least five times in 2015 alone, there was one working toilet available, and that happened for up to a week. And Mr. Womble's testimony is that when these toilets broke, they were down from two to three days or up to a week. Right, so in those circumstances, there would be urine and feces on the floor. So up to two to three days or up to a week, five different times in 2015. And moving- Well, isn't there also evidence in the record, or at least I think the defendants say this, that the bathrooms were cleaned every day and work orders were entered when they were backed up. So even with the overflow, how does that show that the defendants were deliberately indifferent? Maybe they weren't effective with the cleanup, but they weren't ignoring it either. Sure. So two points on that. One, I think it's a disputed fact. Mr. Womble has testimony that I believe his name, the name of the maintenance supervisor is escaping me right now, but these problems were so constant that he told them he just gave up on fixing them. And I think there's also evidence in the record that- You're referring to his testimony or the maintenance supervisor's testimony? The maintenance supervisor's testimony, not testimony, it was Mr. Womble's testimony on things that the maintenance supervisor told him. And can we consider that? I mean, isn't that hearsay? It is hearsay. I do think it's effect on the listener and what he was observing in these conditions. But I also think you can accept the evidence that what Mr. Womble saw and also that he didn't see people fixing these toilets within the timeframe in the maintenance reports. And I think what's important also about the maintenance reports is none of the inmates filled those out. That was all staff. So in terms of reporting instances of when these bathrooms were out, these things could have been going on for days as far as the inmate's concerned, but they had no control over when the maintenance reports were submitted. So in terms of when an inmate like Mr. Womble could have seen a toilet out, he didn't have the ability to go submit a maintenance request. These could have been out for days while the inmates were waiting for them to be cleaned. But yes, some of the maintenance reports did have quicker turnaround times, but I think the record is clear on that, that that is a disputed fact, whether those in fact were fixed in that amount of time here. What is the evidence of the defendant's knowledge then? So, sure. So there is several pieces of evidence here. It's in conversations. It's in RTSs and grievance. And I think there's circumstantial evidence as well that in Mr. Womble's deposition, for instance, these defendants walked the facility, they walked through the pods. So these temporary bathrooms are in the A-South pod. Mr. Womble said from an advantage point, when these defendants are walking through A-South Hall, they could see these temporary bathrooms. They could see into the temporary bathrooms and see the condition of them. They could see feces and urine on the floor. And I think the RTS and grievance record is also evidence that they were put on notice that the bathrooms were deficient here. But also the conversations that he had are evidence that they knew about it, that he asked them to fix these things and they responded by saying, this is permanent. You're gonna have to do your time. Let me ask you this. The testimony is that sometimes the bathrooms weren't unavailable because inmates were using them to do drugs. And Mr. Womble said he never told staff about that because he didn't wanna be a snitch. Does that affect whether they had knowledge of how many bathrooms were available? No, the reason why they weren't available, I don't think is material here. It's whether he alerted them to the fact that there was only one working bathroom or no working bathrooms because they were out of order, which I believe is supported by the record. If there's no other questions immediately, I'd like to reserve my remaining time for rebuttal. Thank you. Ms. Moore? Yes, Ms. Moore. Good morning, your honors. I'm Senior Assistant Attorney General Erin Moore and I'm here on behalf of Chrisman and Sharp. Assistant Attorney General AJ Redding is also here today and he'll be presenting argument on the cost issue. I am only going to address the qualified immunity order by this court. And I'm only going to reserve approximately 12 minutes of my time for the qualified immunity issues. So may I please the court, Chrisman and Sharp respectfully request that you affirm the qualified immunity order. Let me start you with the evidence that the district court decided it couldn't consider. Why was Mr. Womble's declaration not appropriate for consideration at summary judgment? It was only portions of the declaration and it was the portions where he was relying upon Mr. Yoder's evidence. Well, the court didn't consider any of it. No, I think he said only the kitchen. Or only the kitchen portions of the evidence. Well, Mr. Womble worked in the kitchen and some of his declaration are his own observations. And I think that gets to the timeline. Mr. Womble only worked in the kitchen in July of 2016. July of 2016 is 12 to 18 months after Chrisman and Sharp have both left the facility. So there's a timeline issue here. Chrisman and Sharp were only at the facility during these complaints between May 1st, 2014 and either February of 2015 and June of 2015. And that's June 1st of 2015. So anything after the date of June 15, neither Chrisman or Sharp are at the facility. So they have no knowledge, they have no control. They are not there. So that also gets to a commentary on Mr. Cuff's discussion of the bathrooms. And this gets back to the timeline. Now, Mr. Womble, until June 23rd of 2015, was actually assigned to a cell between December of 2014 and June of 2015 to a cell. So he had a dedicated toilet. So he did not have to use the common toilet. So complaints about the common toilets in 2015 are presumably after June when he is reassigned to a common bunk. And Chrisman and Sharp are no longer at the facility. So I don't know how they could have known anything about those issues. Then back to the kitchen. I mean, that's not really what the district court relied on. And he marks in one of the footnotes when they left the facility. But it's not what, if you look at the analysis, that's not what it's based on. Yes, but we're on a de novo review of the record. And I wanted to highlight this as that is an issue that the knowledge issue, because there is a personal participation analysis by the district court that says they couldn't have personally participated in certain things. And the timeline does make this very important because how do you control or do anything if you're not there anymore? So you're saying that the entire time Mr. Womble was in pod A, that Chrisman and Sharp were already gone? No, I'm only saying a portion of the time that they were there. They were there when he starts making his complaints of overcrowding. That is the date of May 1st, 2014. And then Chrisman leaves in June, June 1st of 2015, and Mr. Sharp leaves February 1st of 2015. So we have a compressed timeline of what actually happened. Now- Are you saying he had his own cell during that period of time? A portion of the time. So between May 1st and December, he was in a common bunk. There's a brief period of time where he was in SHU for four days. But for the majority of May 1 to December, he is in a common bunk. But after that, he is in an assigned cell with a dedicated toilet and sink. Where's that in the record? Which part, the dedicated cell? Yeah. The cell, okay. Trying to find where you're arguing this in your brief. There is a footnote also where it talks about his assignments to different areas of the- Well, this seems like your main argument today. It sounds like it's more than a footnote, so- Well, no, when the district court was addressing this. And I just wanted to highlight- No, I'm talking about your argument. Yeah, I don't think your appellate brief or the district court's, I mean, this seems new to me. It's in his footnotes. Well, where, I'm sorry, I missed it too. So where do we find this? It'd be helpful to know. Okay, so on, I'm sorry, I have this all typed up too. Appellate page 227. It shows he is assigned to the cell from December 15th to June 23rd. And that record- I'm right here. And that's in the appellate appendix page. What year? Oh, 2014. December 15th, 2014 is when he is assigned to the cell. Until June- 23rd of 2015. And how does that take the toilet issue out of the picture? Well, he had an assigned toilet. I understand, but he was in a common bunk during part of this too, and he made these arguments, so tell us about that. Okay, so during the other part, the first toilet incident that are recorded are the request to staff, not request to staff, the maintenance records. I'm gonna get lost here. Okay. Focus on the time that he was in the common bunk and the defendants were at the facility. Okay, there are only five total incidents that can be associated with toilets that are the communal toilets in the record. Can you first give us the dates for when he's in potty and either Chrisman or Sharp are still there? May 1st, 2014, when he starts making, when the inmates are, the influx of inmates occurs, he is assigned potty. He is in pot A South from May 1st until he is transferred out of the facility. That's just later. August of-  Okay. So, the first toilet incident that is in the record is on July 7th, and that is a communal toilet, and that's at 312. That's 2014. And then the next toilet incident- Where is he at that time? Is he in the common? He is in the common area, and the record there doesn't actually identify the toilet, but I will give you that it could be the communal one. So, and then there's September 11th. There's a work order for the communal toilet at 322, and it was fixed the same day. So there was an intermittent loss of one toilet. Well, the one thing that the record shows is that only staff made the request for maintenance, and so it depended on how long it was broken before staff made that request. So we don't know if it was broken for a period of time prior to the time that the September 11th request went in. Would you accept that? No. Why not? Because there are the unit managers, there's daily swapping- Do you have evidence in the record that shows that the toilet was not broken for any period of time before September 11th, 2014? I don't think there's evidence that it was broken before that either. There's no evidence either way. Well, there's testimony from Mr. Womble that the inmates couldn't report, make the request. They couldn't put it in writing. They could make oral requests, and Mr. Womble testified that he was making oral requests. Yes. So you're relying on a habit, essentially. There's inspections daily. Yes, and you're relying on that evidence. He has testimony, his sworn statement to the contrary. At summary judgment, we've got to believe him, don't we? You don't have to if it's not credible. We can't decide credibility. Well, not credible in the sense of that. Well, you just said not credible, and that's what the district court did, right? The district court said, I don't think a jury will believe Mr. Womble. I believe his statements are blatantly contradicted by the evidence. Oh, do we have a video? No. Okay. But we have other affidavits. We have people doing daily walkthroughs. They're not seeing this. You have evidence that may well prevail at trial, but that's not the posture of the case. Well, the posture of the case is qualified immunity, and he has to show a constitutional violation. Well, so the first question is whether we have a serious condition, and if, in fact, there was the condition of the toilets were as he has reported, I think you would agree there's case law that would support him that that's serious. He's not confined in the filth. Those cases all require people to be actually confined in the near proximity of the filth for dedicated periods of time. He is not confined in the cell with the filth. Well, he had to clean off his boots a bunch of times. He voluntarily walked into a bathroom with that. There were other facilities that were apparently still operational, and someone might or might not have been locked in. All right, now, let's back up. How do you know he voluntarily? I mean, how can you even know that? How could the record even know that? He said he had to clean off his boots several times. Because he went into a restroom that he, did he have to go in there? Did someone say you have to use that restroom? He said occasionally he could use other restrooms. Did somebody say otherwise? He said he used the library restroom. Well, all right. I'm beginning to realize that. The council wants to give you something here. He's gonna come up and take over here in about 30 seconds. Well, I think we've got some questions for you.  It's gonna be a while. All right. It seems to me the fees all arise with whether we affirm or reverse, though. Well, that's true. I don't know that we need that. Let me ask you this. I don't see your name on the brief. Is that right? That's correct, Your Honor. All right, and we're getting some arguments that really weren't highlighted in the brief. So I'm taking it. I think they were in the footnotes and things that the court was considering. He just didn't spend a lot of time with them. The facts might have been there. Yeah. It wasn't presented to us this way. Yeah. I'm glad the other members of the panel don't remember this either, because I sure do. And as a general rule, we don't take argument in the footnote as being adequately briefed. I understand. Or at least highlight it. Let me put this in perspective, because this happens a lot in these cases. The government is very frustrated because a prisoner is saying things that aren't true, and they're very confident that it's not true, and then they move for summary judgment. And we've got to take their allegations under oath. The prisoner's allegations under oath is true. I think there are records. This is just, it's a premature thing. I can understand your frustration if you think he's totally manufacturing this evidence, but the solution isn't to ignore evidence to obtain summary judgment. And you're putting out, you're mentioning you have good evidence to rebut him. That may well be so, but that's not, that's for the jury to decide, not for the judge at summary judgment. I think the judge got it correct at summary judgment. I don't think there was clearly established law at all points, especially on the processed food. I don't think there's a constitutional right on that. There's lots of different reasons on this case. Counsel, counsel, the judge didn't rely on clearly established law. He did at some points. No, he said what the law is is clearly established, and then he said there was no violation. Now, you're not making a clearly established law argument, at least in your brief. Are you making one today? Is this a new argument as well? No, I'm not. So we're talking about the first step of qualified immunity and whether a reasonable jury could find the objective and subjective components of the food and nutrition and the toilet overflowing claim. Isn't that what's before the court right now? Yes, Your Honor. All right. And I don't think that Mr. Waddle met that burden. And you're not making any argument about clearly established law on appeal? No, Your Honor. All right. Let's turn to the food deprivation part of this so that you don't run out of time on that. Mr. Waddle says that there were blanks in the trays where they weren't filled in. And he says that he told, he orally reported, that he wasn't getting enough food and that the food was spoiled and making him sick. Is that enough? No. What more do we need or what's missing? I think the record just contradicts him completely. And it's not, the record just doesn't support that. The record shows that there were trays being maintained, 73 days worth of trays were being maintained by the kitchen so you could see what was served every day. The master menu was posted on the wall. Chrisman and Sharp were both going through the kitchen routinely. Mr. Sharp was eating in the kitchen routinely. He is not seeing these things. He is looking at these reports, not necessarily daily, but he's doing spot checks of these reports frequently. There is no blanking of the slots. Not all meals require all slots. Well, one of the things that Mr. Waddle says is that the master menu was not accurate. Can we just disregard his sworn testimony? I think it doesn't make, there's no basis for it. He just says it. We don't believe a word he says and maybe you're right about that. But we have to believe what he says unless it's blatantly contradicted by video evidence or something like that. But his is just generalizations. He says he has one menu thing and then he admits in his deposition about bean day, spaghetti day, chicken patty day, and bologna day, and yet none of that is accounted for. And his menus or anything. What do you mean his menus? He provided one menu of, he's routinely getting eight ounces of gravy and whatever and a piece of two biscuits and things that are in the nutrition report. That's the one thing he puts in his declaration. But then in his deposition testimony, he commits to five other different menus that are very different than what he has put in his declaration. And then he says, that's what I'm getting all the time. It's just not based in reality because those bean days and everything show up on the master menus. He doesn't testify that that's what I'm getting all the time. What he testifies to is that whatever they were giving me, it was either spoiled or inadequate in terms of the caloric intake. I don't think he knows what it was supposed to be. Well, and that is again, I mean, I think, like Judge Hartz, I understand your frustration. It's apparent the district court is frustrated too. And he may lose at a trial. He may have a very weak case, but that's not what we do on summary judgment. I don't think he made a question of fact. And the reason you don't think that is that you would discount everything he said because it's not credible. It doesn't actually tell you anything. And it's very vague and generalized. It doesn't give you particularities or specifics, whereas the evidence in the record that is in documents and other things is particularized. Can I just switch to the toilet? Yeah. So let's assume for the sake of discussion, I know you probably don't agree with this, but let's assume for the sake of discussion that the objective component of that claim is satisfied. And on the subjective part of it, that the defendants were aware of a problem with toilet overflow. Okay. But the plaintiff still has to show that they were deliberately indifferent. And what I'm interested in is what's your best argument that they were not deliberately indifferent? Well, I don't agree with the knowledge aspect, but that's, we're assuming that's true.  I don't think it was deliberate because they were trying to have maintenance daily done. Based on when it came to their attentions, repairs were done on a daily basis for the most part. There were a couple of incidences where it took longer than a day, where pants were shoved down the toilet or down a drain, and that was a shower, so that wasn't a toilet. And then there was one toilet incident where there was a towel shoved down the drain, or a towel was shoved down the toilet, and that may have taken a little longer to get out. But they were, apparently had a practice of trying to have maintenance done the same day as a request came in, especially on toilets. That's what the evidence appears to say. Well, his testimony, which is contrary to that, is that the defendants saw what was happening. They would have known that there had been an inordinate amount of time before something was repaired. I think they would testify that they, based on their testimony, they weren't seeing what Mr. Womble says he says they were seeing. So there is not an agreement on what they were seeing. So you'll win a trial, you're saying. Well, I'm saying, Mr. Womble says these were things going on. They're walking there, they're not seeing it. But isn't that a dispute of fact? I don't think, based on the record, he has created a dispute of fact. You can say a lot of things. Because you think he's lying. No, I think he's got some generalizations and he doesn't have a good grasp of time. Because I think some of this is after they're gone. Well, but we have a period of time when they're there. We established that earlier. Yes, but he also testified. So that's what we're focused on. Yes, but he also testified that in May, the toilets were being operated fine. And then he also said the toilets were being operated fine in June. So we have two months. Again, is that? That's in his deposition. Is that 2014? Yes, that's when he's. I mean, we're dealing with a lot of years. Yes, I'm sorry. But at the beginning of the problem, of the overcrowding, he said two months of it, they were operating fine in his deposition. So then we have August, where it may be starting to be a problem for him. Or July. It's just not enough. So how many months, if we take it that there was this problem with feces and everything else, how many months before it becomes severe enough to be a constitutional violation? I don't think it ever did. I'm not asking you that. I'm saying assume that you have the feces and urine and the condition he describes. How many months would a prisoner be required to walk through that before it would reach the level of a constitutional violation? I don't know. We don't have a case law. Well, we do have case law. We have case law of 36 hours. Trapped in a cell. He's not trapped in a cell. It's the exposure to the filth, right? It's the trapped in the cell with the filth and not being able to clean it or escape it. And you said something about the library restroom. Was that always available? He said he worked in the library and that he would use that restroom, too, while he had, when he was working in the library. It's unclear how long he was working in the library, but it was for a period of time. And we don't know whether that period of time co... It does coincide with the May 1st through his time in the common box. And again, I don't remember that argument from the briefs, but maybe I'm getting old and forgetful. Well, your time has expired. Thank you, Your Honor. I think we get the gist of your argument. Thank you. Thank you. Before I pick up on a few points from counsel's argument, I think the main point of what I just heard is indicative of the largest problem of the district court's order here is that the district court did not want to credit Mr. Womble's testimony on summary to judgment. That is the largest source of error here. Getting into some of the specifics, and just where we followed up, there is testimony from Mr. Womble about when these bathroom conditions got worse. They testified that in September, October of 2014 that they got worse. If we think about the timeline here, and this is in the record and in our briefing, there was 328 days total when Mr. Womble was in the temporary box, right? And just to put that into perspective also of when defendants worked there or when he was in the temporary cells, that also means from May 2014 through December of 2014, Mr. Womble was in the temporary situation that caused these constitutional violations. There was an adequate time period of Mr. Womble to do this. And I also think the conditions of confinement are important here. I think both the district court and defendants appear to fault Mr. Womble for walking into these feces-filled bathrooms and not having a notepad with him to note the date and time of every time he was exposed to feces and how long. And I think on the subjective component, we do have guideposts, right? We have 36 hours from disdain for taking and crediting Mr. Womble's evidence here. Two to three days at a time, these were not fixed while they were in existence. Well, it is true that in the 36-hour case, it was in the actual cell. Sure. So, you know, he's sleeping there. It is different, isn't it? It is different. One point that I did disagree with from defense counsel is that Mr. Womble voluntarily used these facilities filled with feces. He didn't voluntarily do that. It was the only bathroom that he had available to him. And, you know, the Eighth Amendment requires that if these prisons are going to confine individuals, they at the very least need to be a constitutional standard. So, yes, he went into that bathroom because it was the only bathroom that he could use and there was feces on the floor and he had to clean his boots off after he used it. And I think one point that I wanted to make quickly from when I was first up here with you, Judge Harts, I do think on the weight loss, there's testimony of defendants who were in the mess hall every day. Defendant Sharp said he ate these meals. He would have known that there was less food on these trays and he also heard Mr. Womble ask him for more food and that's when he responded, you should be grateful you get food. So, I do think that there is evidence that he told them about the lack of food that was leading to his weight loss. But there's a big difference between I'm hungry and I'm starving. I mean, what evidence is there in the record that it was the latter? Right. First, I don't think there needs to be evidence of starvation for there to be a constitutional violation here. It's clear that Mr. Womble was telling them several times, I'm not getting enough food. And while Mr. Womble may have not characterized that as starvation per se, I think he was credible in his testimony on this, his expert did say it was starvation. And at the end of the day, I think it's important to remember how long we've been here. This is 12 years in the running now. I think defendants clearly dispute Mr. Womble's record of events, but I think the best course of action here is for a jury to hear the evidence and finally decide this case. Thank you. Thank you, counsel. Sorry. Sorry. It's not unusual. Thank you, counsel. Case is submitted. Counsel are excused.